# EXHIBIT 6

Claim No.: QB-2018-006323

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
MEDIA AND COMMUNICATIONS LIST

B E T W E E N

JOHN CHRISTOPHER DEPP II

**Claimant**

and

(1) NEWS GROUP NEWSPAPERS LTD
(2) DAN WOTTON

**Defendants**

### RE-AMENDED REPLY

*References to paragraph numbers are to paragraphs of the Re-Amended Defence unless otherwise stated.*

1. The Claimant joins issue with the Defendants on their Defence save for the admissions it contains and those averments therein which are expressly admitted below.

2. It is denied that the words complained of in the meaning relied on by the Defendants in paragraph 8 are true. As to the particulars of Truth, the Claimant pleads as follows:

    2.1. The first and second sentences of paragraph 8a are admitted.

    2.1A In relation to the incidents alleged in the Re-Amended Defence, it is the Claimant's case that he has never hit or committed any acts of physical

1

          violence against Ms Heard. He has never done more than grab her arms to prevent her punching him in the face.

2.2. ~~Save that the general averment in the~~ The third sentence of paragraph 8a is denied. ~~the Defendants have failed to set out any particulars supporting that averment and accordingly the Claimant is unable to respond with any further particularity.~~

**~~Late 2012/e~~Early 2013**

2.2A    Save that the Claimant does not recall ever having a conversation with Ms Heard about a tattoo and is therefore unable to admit or deny whether the conversation as described therein took place, paragraph 8a.1 is denied. It is expressly denied that the Claimant slapped or hit Ms Heard. In ~~late 2012/ee~~arly 2013 (as the Defendants now advance their case) the Claimant confined himself to drinking wine and using marijuana (having been sober from around December 2011 to August 2012).

**8 March 2013**

2.2B    As to paragraph 8a.2:

      2.2B.1  The first sentence is not admitted because the Claimant does not recall whether he was at Ms Heard's home on the 8 March 2013.

      2.2B.2  The second sentence is denied. The signed painting by Ms Heard's former wife, Tasya Van Ree, was hanging by Ms Heard's bed. On a date the Claimant cannot now recall the Claimant asked Ms Heard, as a courtesy, if she would move the painting somewhere else.

      2.2B.3  The third sentence is denied. The Claimant accepts that Ms Heard's extreme reaction to his request did continue into the following day. The Claimant did not attempt to set fire to the painting, either on the morning after the alleged incident or at all.

2.2B.4 The fourth and fifth sentences are denied. The Claimant did not hit Ms Heard at all, nor did he grab, shake or shove her into a wall.

2.2B.~~3~~5 The ~~third~~sixth sentence is not admitted; the Claimant does not recall Ms Heard's sister being asked to come over.

~~2.2B.4 The fourth sentence is denied. The Claimant did not hit Ms Heard.~~

2.2B.~~5~~6 As to the ~~fifth~~seventh sentence: it is admitted that the Claimant had an exchange of texts with Ms Heard on 12 March 2013 containing the words quoted therein. The words were used to placate Ms Heard; it is denied that the texts relate to any alleged physical abuse of Ms Heard (which is denied).

~~2.2B.6 The fifth sentence is denied: the Claimant did not try to set fire to the painting, either on the morning after the alleged incident or ever.~~

**June 2013, Hicksville**

2.2B.a As to paragraph 8.a.2.A, it is admitted that the Claimant was in Hicksville in or around June 2013, with Ms Heard and some of her friends. It is further admitted that the Claimant took mushrooms and alcohol. Ms Heard and her friends also took mushrooms and alcohol, along with MDMA. The Claimant did not know the girl the Defendants refer to as being called Kelly-Sue. It is admitted that this girl was touching Ms Heard, but it was in an extremely sexual manner. It is denied that the Claimant became enraged, grabbed her wrist, threatened or hurt her in any way.

2.2B.b The Claimant did speak with this girl, to explain that while he understood that she was high, she should stop touching Ms Heard in such a sexual manner. It is denied that the Claimant threw or smashed glasses, or ripped Ms Heard's dress. The Claimant did knock a wall sconce with his hand in

3

3408654_5

the cabin, following an extended barrage of loud and nasty verbal abuse by Ms Heard. The Claimant approached the person managing the Hicksville site the following morning to address replacing the wall sconce, which was arranged without issue. The Claimant's position as to the new alleged incidents raised in the Confidential Schedule to the Re-Amended Defence are contained in the Confidential Schedule to this Re-Amended Reply.

**24-25 May 2014**

2.2C    Save that the first sentence is admitted, paragraph 8a.3 is denied. Specifically it is denied that the Claimant behaved in any of the ways alleged during the flight on 24 May 2014. The Claimant and Ms Heard were seated at the central table in the cabin. As the Claimant drew sketches in his notebook, Ms Heard began to harangue him. This quickly progressed to the continuous verbal barrage on her part, with which the Claimant did not engage but continued sketching. Ms Heard stood up. In the hope of calming her, the Claimant stretched his leg out to playfully tap her on the bottom with his foot, but did not reach her. Ms Heard took great offence at this harmless act, and continued to verbally berate the Claimant. It is denied that the Claimant slapped Ms Heard in the face or at all. Eventually, Stephen Deuters and Jerry Judge intervened to calm Ms Heard down, and the flight continued to LA without incident. The Claimant took himself to the plane's bathroom, locked the door and slept on the floor with a pillow.

2.2D    The first sentence of paragraph 8a.4 is denied: paragraph 2.2C above is repeated. It is admitted that Stephen Deuters had a text exchange with Ms Heard on 25 May 2014 in which Mr Deuters said that the Claimant had cried when he had been told that he "*kicked*" Ms Heard. However, Mr Deuters only used this word because it was a word Ms Heard had used and he wished to mollify her as was the Claimant's specific instruction. It was not because the Claimant had in fact "kicked" Ms Heard. As to the second sentence: it is admitted that the Claimant sent Ms Heard a text message containing the words quoted therein, but it is denied that the said

4

3408654_5

text amounted to an admission that the Claimant had behaved in the way alleged.

**17 August 2014**

2.2E    The first sentence of paragraph a.5 is admitted save that the purpose of the trip was for the Claimant to cure his dependence on painkillers and not other drugs. The second sentence is denied. Ms Heard was only present because she had insisted on going on the trip and taking the place of Nathan, the Claimant's assistant. The Claimant required 24 hour medical care and was frequently sedated because of the physically painful process of withdrawal. The Claimant was being treated by a nurse, Debbie Lloyd, but Ms Heard intervened and withheld medicine from the Claimant causing him to have spasms and withdrawals. As a result, Dr David Kipper was flown in to attend to the Claimant and they returned earlier to Los Angeles than planned. The Claimant then asked Ms Heard to leave him alone and paid for a suite for her and her friends at the Beverley Hills Hotel for five days so he could recover undisturbed. The third and fourth sentences are denied; the Claimant did not assault Ms Heard, nor did he kick or splinter a door. The photograph that Ms. Heard presented, which was purported to be a damaged door from the property in the Bahamas is in fact a door at one of the Claimant's properties in Los Angeles.

**17 December 2014**

2.2F    As to paragraph 8a.6 without prejudice to the fact that the Defendants have failed to provide any particulars of the alleged violence, it is denied that the Claimant had been violent towards Ms Heard on 17 December 2014 or that the text messages sent on that date were an apology for any alleged violence on the part of the Claimant.

**25 January 2015**

2.2G    Save that it is admitted that the Claimant and Ms Heard were in Tokyo on or around 25 January 2015, paragraph 8a.7 is denied.

5

**March 2015**

2.2H    Save that it is admitted that the Claimant and Ms Heard were both in Australia in March 2015, paragraph 8a.8, 8a.9 and 8a.10 are denied. There was only the one incident referred to below:

   2.2H.1  Immediately before 8 March 2015, Ms Heard had a conversation with the Claimant's then lawyers, Bloom Hergott who explained the Claimant's intention to enter into a post-nuptial agreement. On 8 March 2015 this caused Ms Heard to go into a prolonged and extreme rage. The Claimant had been retreating from Ms Heard throughout the day, seeking refuge in locked bathrooms in the house. Ultimately, the Claimant, who had not had a drink in over a year, sought to avoid Ms Heard by going to the downstairs bar in the house. She followed him, screaming at him abusively. The Claimant did not grab or hurt Ms Heard in any way. He did not threaten her, hold her by the hair or the neck, slap her or otherwise attack her in any of the ways described in paragraphs 8.a.8 - 8.a.10. The Claimant simply sought to remove himself to other parts of the house consistently throughout the day.

   2.2H.2  The Claimant poured himself a number of glasses of vodka and drank them. Ms Heard took a bottle and threw it at the Claimant's head, narrowly missing him. The bottle flew past his head, smashing into the mirror and bottles behind him. The Claimant poured and had another drink of vodka. Ms Heard took another bottle and threw it at the Claimant. The Claimant's hand was resting on the marble top of the bar, the bottle smashed against his finger, severing the top of his finger and fracturing multiple bones in it. Ms Heard then put a cigarette out on the Claimant's right cheek.

2.2H.3 The Claimant was first taken to the home of one of his security guards, Malcolm Connelly. The Claimant's injury to his finger was assessed and considered to be too serious to be treated there. The Claimant was then taken promptly to hospital for treatment to his hand no later than ~~6~~4.30pm on 8 March 2015, according to the hospital records.~~.~~

2.2H.4 For the avoidance of doubt, it is expressly denied that the Claimant took MDMA, that Ms Heard found a bag of MDMA pills or that there was any conversation about MDMA.

2.2H.5 The further incidents set out in the Defendant's Confidential Schedule to the Re-Amended Defence are responded to in the Confidential Schedule to this Re-Amended Reply.

2.2I As to paragraph 8a.11: it is admitted that the Claimant wrote on a mirror and walls in blood and oil paint. The Claimant was in shock. It is denied that the Claimant urinated over the house as alleged.

**March 2015**

2.2J Paragraph 8a.12 is denied. It is denied that the Claimant destroyed the personal property as alleged. It is further denied that the Claimant was violent in any way towards Ms Heard or her sister. The Claimant was attempting to leave the house. Ms Heard tried to prevent him, berating him in a rage. The Claimant summoned help from~~causing~~ Debbie Lloyd and Travis McGivern~~s~~ (a security guard) prompting them to arrive on the scene to intervene. Ms Heard threw a can of Red Bull at the Claimant, striking him in the back. Ms Heard then threw another object at him, which McGivern~~one of those present~~ blocked from hitting him. Mr McGivern~~The security present~~ tried to protect the Claimant by standing between him and Ms Heard, but she lunged at him, punching him in the face with a closed fist causing him visible swelling and injury. The Claimant did not retaliate but simply left the premises.

7

**August 2015**

2.2K   Save that it is admitted that the Claimant and Ms Heard travelled on the Eastern and Oriental train in August 2015, paragraph 8a.13 is denied.

**26 November 2015**

2.2L   Save that it is admitted that the Claimant and Ms Heard were in Los Angeles on 26 November 2015 for Thanksgiving, paragraph 8a.14 is denied.

**15 December 2015**

2.2M   Save that the first sentence is admitted, paragraph 8a.15 and paragraphs 8a.16, 8a.17, 8a.18 and 8.a.19 and a.20 are denied. Ms Heard fabricated the alleged violence and, as part of that pretence, falsely claimed that the blonde hair on the floor was her hair that had been pulled out by the Claimant. The only violence committed on that date was by Ms Heard; she violently attacked the Claimant, leaving him with scratches and swelling around his face. The day after the alleged incident, Ms Heard had no visible injuries on her face.

**21 April 2016**

2.3.   The first sentence of paragraph 8b is admitted.

2.4.   Save that it is admitted and averred that the Claimant arrived at the party just under two hours late, having been at a meeting with his recently hired business manager and his accountants, the second sentence of paragraph 8b is denied. Earlier that day, the Claimant had told Ms Heard about this important meeting and, during the meeting itself, texted Ms

8

3408654_5

Heard to let her know that he was likely to get out of the meeting far later than the birthday dinner was scheduled to start. The Claimant was not drunk or high on drugs; he was shocked from what he had learnt at the meeting about his business affairs. Despite the Claimant having told Ms Heard the reason why he was unable to make the birthday dinner on time, and had kept her updated by text, Ms Heard was cold towards the Claimant when he arrived.

2.5. As to the third and fourth sentences of paragraph 8b: it is admitted and averred that after the guests had left, Ms Heard began criticising the Claimant for being late. The Claimant got into bed and began reading, and Ms Heard, who had been drinking heavily, became aggressive and violent towards the Claimant, punching him twice in the face as he lay in bed. dThe Claimant stood up and asked Ms. Heard if she wanted to hit him again. She did so, punching the Claimant twice in the face. The Claimant defended himself by grabbing Ms Heard's arms to stop her punching him again and told her to stop. He pushed her away from him onto the bed and told her he was leaving and that she should not follow him.

2.6. The Claimant called Sean Bett (a member of his security team, and an 18 year veteran detective of the LA Sheriff's Department), who was stationed in a penthouse apartment next door, and asked to be driven home, explaining that Ms Heard was "at me it again", or words to that effect. The Claimant was taken by Mr Bett to the Claimant's house in West Hollywood. The Claimant did not toss aside or smash items as he left. Mr Bett took a photograph of the injury to the Claimant's face.

2.7. The fifth and sixth sentences of paragraph 8b, and paragraph 8c in its entirety are denied, save that, the Claimant cannot recall whether he left a note saying "*Happy fucking Birthday*". Paragraphs 2.5 and 2.6 above are repeated.

9

    2.7A      The following morning, Ms Heard (or possibly one of her friends) defecated in the Claimant's and Ms Heard's bed. On 12 May 2016, Ms Heard told the Estate Manager, Mr Murphy, that leaving the faeces in the Claimant's bed had been "*just a harmless prank*" thereby effectively acknowledging that she had been responsible.

    2.7B      The Claimant then resolved to divorce Ms Heard.

**21 May 2016**

    2.8.      As to paragraph 8d:

        2.8.1. The first sentence of paragraph 8d is admitted, although in the meantime, Ms Heard repeatedly tried to contact the Claimant directly and through her sister, Whitney Heard, who pleaded for the Claimant to get back in touch with Ms Heard.

        2.8.2. The second sentence of paragraph 8d is admitted save that the Claimant cannot recall the precise time he arrived at the South Broadway apartment, and accordingly no admission is made as to the time. The Claimant texted Whitney Heard on 21 May 2016 at 7.30 pm in response to a text he received from her at 7.15 pm, suggesting his arrival may have been later than 7.15pm.

        2.8.3. The building has multiple penthouses, some of which are adjoining. Penthouse 3 is the location Ms Heard alleged the "abuse" occurred; Penthouse 5 is the penthouse across the hallway in which Ms Heard and Ms Pennington claimed Mr Depp "destroyed" items on that evening. Penthouse 4 adjoins Penthouse 3.

        2.8.4. The third sentence of paragraph 8d is denied. The Claimant was not drunk or high when he arrived. The Claimant came to the

10

South Broadway apartment with two of his security team, Mr Bett and Jerry Judge, to collect some of his belongings from Penthouse 3. The Claimant brought his security guards with him precisely because he was concerned about what Ms Heard might do. The security guards waited immediately outside the door of Penthouse 3.

2.8.5. The fourth sentence of paragraph 8d is denied: to the best of the Claimant's knowledge at the time, Ms Heard was alone in Penthouse 3 when he arrived, although the Claimant now believes and Ms Pennington must have been hiding in the Penthouse. came into Penthouse 3 a few minutes after the Claimant arrived. The Claimant does not know who Elizabeth Marz is, but observed a woman in Penthouse 5 with Mr Drew.

2.8.6. It is admitted that Ms Pennington kept a key to the South Broadway apartment, and that a number of Ms Heard's friends including Ms Pennington and Mr Drew lived in and worked out of the Claimant's penthouse apartments rent-free for approximately 4 years.

2.9. Save that no admissions are made as to whether Ms Heard sent a text to Ms Pennington, or as to what iO Tillett Wright said to Ms Heard on the phone as this is outside the Claimant's knowledge, paragraphs 8e to 8l are denied:

2.9.1. When the Claimant arrived at Penthouse 3 his security guards waited just outside the door while the Claimant went in for approximately 10 minutes in total. Ms Heard was in the penthouse when the Claimant arrived. upstairs at the time the Claimant

11

~~entered the penthouse. When the Claimant went upstairs to get his belongings,~~

2.9.1A  The Claimant and Ms Heard called Kevin Murphy from downstairs. The Claimant asked Mr Murphy to repeat to Ms Heard what he had earlier told the Claimant about Ms Heard's admission that the defecation in the bed was "*just a harmless prank.*" Mr Murphy repeated that Ms Heard had admitted to him that she was responsible. Ms Heard yelled and swore at Mr Murphy, repeatedly calling him "*a fucking liar*". The Claimant told Ms Heard not to speak to Mr Muprhy in that way and that he wanted a divorce. As Ms Heard would not stop screaming, Mr Murphy hung up the phone.

2.9.1B  The Claimant went upstairs to collect his belongings. Downstairs, Ms Heard ~~went downstairs~~ telephoned iO Tillett Wright and began talking loudly on the phone ~~to Ms Wright~~ in mocking and goading terms about the Claimant and the defecation incident.

2.9.2  ~~Ms Pennington either used her key to let herself into Penthouse 3 or arrived from the adjoining Penthouse 4, (using a different entrance to the door where the security guards were waiting.) The Claimant came downstairs. Ms Pennington was sitting next to Ms Heard on the sofa. There was no conversation between Ms Heard and the Claimant, and Ms Heard did not call one of the Claimant's employees.~~

2.9.3  The Claimant then went back downstairs, and took the phone in order ~~asked~~ to speak to ~~Ms~~iO Tillet Wright. ~~and Ms Heard handed him the phone.~~ The Claimant said to ~~Ms~~ iO Tillett Wright "*you got what you want, you can have her* [Ms Heard]"*… I don't care, it's over*" or words to that effect. He then tossed the phone onto the sofa and crossed the room away from Ms heard towards the kitchen which was some 20 feet away from Ms Heard who was sitting on the sofa. The Claimant did not scream profanities or

12

insults. The Claimant did not "storm" upstairs or come back down and grab the phone for a second time.

2.9.4 The phone did not his Ms Heard on the face or elsewhere. Nor did the Claimant pull Ms Heard's hair or strike her, or grab her face, or touch her, or slap, shake and yank Ms Heard around the room or say the words alleged in paragraph 8h. Two police officers who attended the apartment directly after the alleged incident and interviewed Ms Heard twice in good light, saw no injuries or bruising or swelling to Ms Heard's face (or elsewhere). When one of the officers asked Ms Heard what had happened she responded "*nothing*". When Ms Heard was asked if she was hurt, she shook her head. Ms Heard did not say to the officers that she had been assaulted, and when asked if she had been injured in any way she said she ~~was~~ wasn't injured and refused medical treatment. Ms Heard said she did not want to make a police report and there was nothing wrong. Ms Heard had no visible injuries the following day.

2.9.5 Both of these officers subsequently confirmed their evidence to this effect in separate depositions, which are attached to this Reply at **Annex A**. In the premises, if and to the extent that Ms Pennington subsequently took a photograph of Ms Heard's face (as pleaded in paragraph 8g and which is not admitted), it was not a photograph of any "injury" caused by the Claimant. In the subsequent proceedings brought by Ms Heard, hardcopy photographs were put in evidence, but neither the original images nor the associated metadata were produced.

2.9.6 As the Claimant was crossing the room away from Ms Heard towards the kitchen, Ms Heard began shouting. Upon hearing Ms Heard shouting, the security guards immediately, i.e. within one or two seconds, opened the door and rushed into Penthouse 3 via the kitchen where the Claimant was standing. Immediately upon opening the door, the security guards observed the Claimant standing in the kitchen area, far away from Ms Heard. Ms Heard was repeatedly screaming ~~At that moment, Ms Heard yelled~~ "*stop

13

*hitting me Johnny*" (or words to that effect) into the phone before and at the moment the guards entered. The Claimant was not hitting Ms Heard. He was standing in the kitchen, approximately 20 feet away from Ms Heard. Just before the security guards entered, Ms Pennington suddenly appeared from behind the Claimant, running past his right side towards Ms Heard and ran to Ms Heard from behind the Claimant, shouting "*Don't do it, stop it, leave her alone*" (or words to that effect). Ms Heard and Ms Pennington were standing in front of the sofa about 25 feet away from the Claimant.

2.9.7 Ms Heard was visibly shocked to see the security guards enter, and attempted to feign crying, as did Ms Pennington. Ms Heard changed from the present tense to the past tense and said: "*he hit me with a phone*" and "*that's the last time you hit me Johnny*" and "*You better not hit me again*" (or words to the effect). The Claimant did not move but said: "*What are you talking about? You're crazy. I didn't hit you.*" Ms Heard screamed "*Call 911*" (presumably because Ms iO Tillett Wright was still on the phone). One of the security guards, Mr Judge, said to Claimant: "*Let's just get out of here boss*" and took the Claimant immediately out of the door.

2.9.8 There was no interaction between the security guards and Ms Heard. The time between the security guards entering the apartment and leaving with the Claimant was less than a minute about 30 seconds. The Claimant did not move from the kitchen from the time the security guards entered to the point he left the penthouse with them. The Claimant did not touch or approach Ms Pennington during the entire time she was there.

2.9.9 The Claimant did not smash any items in Penthouse 3, Penthouse 5 or elsewhere, nor did he kick a hole in a door. For the avoidance of doubt: the Claimant did not brandish a magnum sized, or any other sized bottle of wine, or any object at all. The Claimant did not use a bottle to, or otherwise, strike glass, fruit, cutlery,

14

> flowers, candles or any other object. The police officers who attended shortly after the alleged incident, inspected the property and saw no smashed items, broken bottles, broken glass, destroyed cutlery, destroyed flowers, or spilled wine in either Penthouse 3 or 5, (as detailed in their depositions at Annex A). In the premises, if and to the extent that Ms Pennington subsequently took photographs of smashed items (as pleaded in paragraph 8g and which is not admitted), those items were not smashed by the Claimant.

2.9.10 After leaving Penthouse 3, the Claimant went with his security guards to check Penthouse 5 where he discovered Mr Drew, a woman (whom he now presumes was Elizabeth Marz) and a dog. It appeared they were using Penthouse 5 to operate their business (some kind of craft beading business). The Claimant ordered them to leave Penthouse 5 which they did and the Claimant and his security then left at about 8.30pm.

2.10 Save that the imputation that Ms Heard needed to be kept "safe" from the Claimant is denied, no admissions are made as to paragraph 8m because the Claimant does not know what Ms Heard did after he left Penthouse 3.

2.11 As to paragraph 8n: it is admitted that Ms Heard filed a petition for the dissolution of her marriage to the Claimant on 23 May 2016 and issued an application for a domestic violence restraining order against the Claimant on 27 May 2016 but it is denied that this was "following the incident" as described in the Defence. The second and third sentences are admitted.

2.12 It is admitted that Ms Heard's declaration contained the matters set out in paragraph 8o of the Defence as originally filed; it contained none of the other alleged incidents added by amendment. As to the first sentence of that paragraph, the true facts are set out above. As to the second to fourth sentences, the Claimant does not plead further to the second to fourth sentences as it is not necessary to do so.

2.13 Paragraph 8p is admitted. Ms Heard repeatedly failed to cooperate with the court process and in particular attended but refused to participate in her first scheduled deposition. A number of Ms Heard's witnesses repeatedly delayed attending for deposition.

2.14 Paragraph 8q is admitted. Ms Heard's application for a restraining order was dismissed with prejudice.

~~JAMES PRICE QC~~
~~VICTORIA JOLLIFFE~~
~~DESMOND BROWNE QC~~
~~VICTORIA JOLLIFFE~~

**DAVID SHERBORNE**
**ELEANOR LAWS QC**

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in this Re-Amended Reply are true and I am duly authorised by the Claimant to sign this statement on his behalf.

Signed............[signature]............

Name: **Joelle Rich** ~~Jenny Afia~~

Date: 25 February 2020

Served this 25th day of February 2020 by Schillings International LLP, Solicitors on behalf of the Claimant.

16

3408654_3